**PENNZOIL COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–2174.

United States Court of Appeals,
Fifth Circuit.*
Unit A

March 22, 1982.

Stephen L. Teichler, Charles M. Darling, IV, Charles E. Suffling, Baker & Botts, Washington, D. C., Patricia Curran, Julie Langdon, Houston, Tex., for Pennzoil Co.

George H. Williams, Jr., Washington, D. C., for Federal Energy Regulatory Com'n.

Thomas G. Johnson, Robert A. Hasty, Jr., Houston, Tex., for intervenor Shell Oil Co.

Frederick Moring, Jennifer N. Waters, Washington, D. C., for Associated Gas Distributors.

Before CHARLES CLARK, GARZA and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

■ The single question here presented is whether the Federal Energy Regulatory Commission (FERC) may refer to private contract pricing provisions to assist it in identification of natural gas whose production entails such extraordinary risks or costs that it would not be undertaken absent the availability of a special incentive price. We hold both that it has the authority to do so, and that it has in this instance used that authority in a manner neither arbitrary nor capricious, but reasonably related to attainment of the controlling, congressionally-defined, objective. FERC's orders are, therefore, affirmed.

I.

Section 107 of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3317, grants authority to FERC to

(b) by rule or order, prescribe a maximum lawful price, applicable to any first sale [1] of any high-cost natural gas, which

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

1. A first sale is in general terms any sale, exchange, or other transfer for value of natural

exceeds the otherwise applicable maximum lawful price to the extent that such special price is necessary to provide reasonable incentives for the production of such high-cost natural gas.

In NGPA § 107(c)(1)-(4), 15 U.S.C. § 3317(c)(1)-(4), the Congress specifically identified four sources from which gas produced would be deemed "high-cost natural gas." [2] These sources are not, however, exclusive. NGPA § 107(c)(5) provides that the term "high-cost natural gas" may be extended to include gas "produced under such other conditions as the Commission determines to present extraordinary risks

or costs," 15 U.S.C. § 3317(c)(5). By rulemaking proceedings initiated shortly after President Carter's July 16, 1979, address to the Congress, encouraging creation of incentives for the development of gas from tight formations,[3] FERC set about identifying tight formation gas for which a special price would be "necessary" to induce production, and establishing a maximum lawful price adequate to provide "reasonable" incentive to such production.

Petitioner Pennzoil Company and intervenor Shell Oil Company have asked this Court to set aside the orders developed in these proceedings [4] because these orders tie

gas by the producer of that gas to any interstate or intrastate pipeline, local distribution company, or user of that gas. NGPA § 2(21), 15 U.S.C. § 3301(21).

**2.** Section 107(c) states:

(c) Definition of high-cost natural gas

For purposes of this section, the term "high-cost natural gas" means natural gas determined in accordance with section 3413 of this title to be—

(1) produced from any well the surface drilling of which began on or after February 19, 1977, if such production is from a completion location which is located at a depth of more than 15,000 feet;

(2) produced from geopressured brine;

(3) occluded natural gas produced from coal seams;

(4) produced from Devonian shale; and

(5) produced under such other conditions as the Commission determines to present extraordinary risks or costs.

**3.** A "tight formation" is a "sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock. Because such a formation is characterized by low permeability, wells drilled into gas-bearing formations of this kind usually produce at very low rates. To stimulate production from these formations, producers must use expensive enhanced recovery techniques. The technique usually applied to tight formations involves massive hydraulic fracturing, which creates a system of cracks permitting trapped gas to flow more easily into a well bore," Order No. 99, Docket No. RM79–76, Final Rule at 2–3 (August 15, 1980).

**4.** The orders under review, both unpublished, are Order No. 99, High-Cost Natural Gas Produced from Tight Formations, Docket No. RM 79- 76, Final Rule (August 15, 1980), and Order No. 99--A, Order Denying Rehearing and Clarifying Order 99, Docket No. RM 79–76 (October 21, 1980).

The rules promulgated by Order 99 provide, in pertinent part:

§ 271.701 *Applicability*

This subpart implements section 107(b) and (c) of the NGPA and applies to the first sale of natural gas which a jurisdictional agency determines is:

(a) Tight formation gas for which there is a negotiated contract price. . . .

§ 271.702 *General rules.*

(a) *Definitions.* For purposes of this subpart:

(1) "Negotiated contract price" means any price established by a contract which either specifically references the incentive pricing authority of the Commission under section 107 of the NGPA or contains a fixed rate or a fixed escalator clause. . . .

§ 271.703 *Tight formations.*

(a) *Maximum lawful price for tight formation gas.* The maximum lawful price, per MMBtu, for the first sale of tight formation gas for which there is a negotiated contract price shall be the lesser of:

(i) the negotiated contract price; or

(ii) 200 percent of. the maximum lawful price specified for Subpart C of Part 271 in Table I of § 271.101(a).

(b) *Definitions.*

(1) "Tight formation gas" means new tight formation gas or recompletion tight formation gas.

(2) "New tight formation gas" is natural gas:

(i) which is new natural gas, (as defined in section 102(c)), certain OCS gas qualifying for the new natural gas ceiling price (as defined in section 102(d)), or gas produced through a new on-shore production well (as defined in section 103(c)); and

(ii) which is produced from a designated tight formation through a well the surface drilling of which began on or after July 16, 1979. . . .

(5) A "designated tight formation" is a natural gas formation which is designated a

the availability of the newly established incentive price for "tight formation" gas [5] to the presence of specified pricing provisions in the private contracts governing the production and sale of such gas. These orders allow the incentive price only to tight formation gas sold pursuant to governing contract pricing terms stating either a specified fixed rate, or a rate determined by operation of a fixed escalator clause, or a rate set by reference to FERC's authority to prescribe a maximum lawful price for such high cost natural gas under NGPA § 107, 15 U.S.C. § 3317. Pennzoil and Shell contend that this requirement, referred to as the "negotiated contract price requirement," effectively deems indefinite price escalator clauses to be inadequate contractual authority to collect the maximum lawful price for sales of gas which otherwise properly qualify as "high cost natural gas

produced from tight formations" under the terms of the orders. In their view, the negotiated contract price requirement, by partially abrogating private authority to set natural gas prices at any price not exceeding the duly prescribed maximum lawful price, exceeds the limitation on FERC's authority over contractual pricing provisions imposed by the codification of the *Mobile-Sierra* "ceiling price" doctrine in section 101(b)(9) of the NGPA, 15 U.S.C. § 3311(b)(9), *Pennzoil Co. v. FERC*, 645 F.2d 360, 374 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).[6] Pennzoil and Shell buttress their argument by noting that congressional restrictions on the use of indefinite price escalator clauses, found in sections 105 and 313(a) of the NGPA, 15 U.S.C. §§ 3315, 3373(a),[7] do not bar the use of such clauses

---

tight formation by the Commission pursuant to paragraph (c) of this section.

18 C.F.R. §§ 271.701–03.

Order 99–A denied rehearing on Pennzoil's objections to the negotiated contract price requirement.

**5.** The NGPA § 107 incentive price ceiling is 200% of the price established by NGPA § 103, 15 U.S.C. § 3313, for new onshore gas wells. 18 C.F.R. § 271.703(a)(ii).

**6.** NGPA § 101(b)(9), 15 U.S.C. § 3311(b)(9), provides:

SEC. 101. INFLATION ADJUSTMENT; OTHER GENERAL PRICE CEILING RULES.

(9) EFFECT ON CONTRACT PRICE.—In the case of—

(A) any price which is established under any contract for the first sale of natural gas and which does not exceed the applicable maximum lawful price under this title, or

(B) any price which is established under any contract for the first sale of natural gas which is exempted under subtitle B of this title from the application of a maximum lawful price under this title.

such maximum lawful price, or such exemption from such a maximum lawful price, shall not supersede or nullify the effectiveness of the price established under such contract. The *Mobile-Sierra* doctrine draws its name from *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Decided under, respectively, the Natural Gas Act of 1938, 15 U.S.C. §§ 717–717w and the Federal Power

Act, 16 U.S.C. §§ 824 *et seq.*, the central tenet of these cases was that those acts "did not displace but only superimposed federal regulation on private contractual arrangements," *Pennzoil*, 645 F.2d at 373. This Court found in *Pennzoil* that NGPA § 101(b)(9) "simply codifies the ceiling price [rule] made plain in *Mobile-Sierra:* the statute's operation is limited to keeping sales prices from exceeding the ceiling [prices, and] contractual authority is required to collect permissible rates," *id.* at 374.

**7.** NGPA § 105, 15 U.S.C. § 3315, states in pertinent part:

SEC. 105. CEILING PRICE FOR SALES UNDER EXISTING INTRASTATE CONTRACTS.

(a) APPLICATION.—The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on the day before the date of the enactment of this Act.

(b) MAXIMUM LAWFUL PRICE.—

(1) GENERAL RULE.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, to which such natural gas was subject on the date of the enactment of this Act, as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under section 102 (relating to new natural gas). . . .

in contracts governing the sale of high cost natural gas.[8]

FERC, joined by intervenor Associated Gas Distributors,[9] asserts that Pennzoil and Shell have misconstrued the purpose of the negotiated contract price requirement. FERC [10] contends that the disputed requirement does not act to disallow the incentive

(3) PRICE INCREASES RESULTING FROM INDEFINITE PRICE ESCALATOR CLAUSES.—

(A) IN GENERAL.—Effective January 1985, and each month thereafter, in the case of any first sale of natural gas, which is sold at a price established under any indefinite price escalator clause of any existing contract or successor to an existing contract and for which the contract price on December 31, 1984, is higher than $1.00 per million Btu's, the maximum lawful price under this section for any such natural gas delivered during any month shall be the higher of—

(i) the maximum lawful price, per million Btu's, computed under paragraph (2)(B); or

(ii)(I) in the case of January 1985, the maximum lawful price, per million Btu's, computed under section 102 (relating to new natural gas) for such month; and

(II) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this clause for the immediately preceding month multiplied by the monthly equivalent of the sum of a factor equal to the annual inflation adjustment factor applicable for such month plus .03.

(B) DEFINITION OF INDEFINITE PRICE ESCALATOR CLAUSE.—For purposes of this paragraph, the term "indefinite price escalator clause" includes any provision of any contract—

(i) which provides for the establishment or adjustment of the price for natural gas delivered under such contract by reference to other prices for natural gas, for crude oil, or for refined petroleum products; or

(ii) which allows for the establishment or adjustment of the price of natural gas delivered under such contract by negotiation between the parties.

\* \* \* \* \* \*

(D) EXCLUSION.—Subparagraph (A) shall not apply to . . . high-cost natural gas (as defined in section 107(c)) . . .

NGPA § 313, 15 U.S.C. § 3373 provides:

SEC. 313. EFFECT OF CERTAIN NATURAL GAS PRICES ON INDEFINITE PRICE ESCALATOR CLAUSES.

(a) HIGH–COST NATURAL GAS.—No price paid in any first sale of high-cost natural gas (as defined in section 107(c)) may be taken into account in applying any indefinite price escalator clause (as defined in section 105(b)(3)(B)) with respect to any first sale of any natural gas other than high-cost natural gas (as defined in section 107(c)).

(b) OTHER TRANSACTIONS.—No price paid—

(1) in any sale authorized under section 302(a), or

(2) pursuant to any order issued under section 303(b), (c), (d), or (g),

may be taken into account in applying any indefinite price escalator clause (as defined in section 105(b)(3)(B)).

8. Pennzoil and Shell have raised in this appeal a number of challenges to Order 99 which were not presented in Pennzoil's application for rehearing. To the extent that these issues are not necessarily resolved in the course of decision of the issues properly preserved for judicial review, they will not be considered here. 15 U.S.C. § 3416(a)(4); *Ecee v. FERC*, 611 F.2d 554 (5th Cir. 1980).

9. Associated Gas Distributors represents: Baltimore Gas & Electric Co., Bay State Gas Co., The Berkshire Gas Co., Boston Gas Co., The Brooklyn Union Gas Co., Cape Cod Gas Co., Central Hudson Gas & Electric Corp., Chesapeake Utilities Corp., City of Holyoke, Mass., Gas & Electric Dept., City of Westfield Gas & Electric Light Dept., Commonwealth Gas Co., Concord Natural Gas Corp., The Connecticut Gas Co., Consolidated Edison Company of New York, Inc., Delmarva Power & Light Co., Elizabethtown Gas Co., Fall River Gas Co., Fitchburg Gas & Electric Light Co., Gas Service, Inc., Haverhill Gas Co., Long Island Lighting Co., Lowell Gas Co., Lynchburg Gas Co., Manchester Gas Co., New Bedford Gas & Edison Light Co., New Jersey Natural Gas Co., New York State Electric & Gas Corp., North Carolina Natural Gas Corp., Philadelphia Electric Co., Philadelphia Gas Works, Providence Gas Co., Public Service Company of North Carolina, Inc., Public Service Electric & Gas Co., South Jersey Gas Co., The Southern Connecticut Gas Co., Tiverton Gas Co., UGI Corporation, Valley Gas Co., Washington Gas Light Co.

10. Associated Gas Distributors urges this Court to adopt FERC's interpretation of the function of the negotiated contract price requirement. It also argues that if this Court should find the negotiated contract price requirement to be, as Pennzoil and Shell contend, a limitation on contractual authority to collect the § 107 price, rather than, as FERC urges, an element in identification of gas qualifying for the § 107 price, that requirement is a reasonable and appropriate exercise of FERC's authority under § 101(b)(9) to define the contractual language which assures that collection of the special incentive price is appropriate under § 107(b).

price to gas which concededly *qualifies* as "high-cost natural gas produced from tight formations." Rather, FERC argues, the negotiated contract price requirement is an essential element of its method for *identifying* the tight formation gas which, absent the availability of an incentive price, would not be produced.

Resolution of these contentions requires that the negotiated contract price requirement be understood in the context of the rule-making proceedings in which it was developed. A review of the course of those proceedings is in order.

## II.

The starting point for the proceedings, as for our review of their result, was the few, terse instructions with which the Congress committed the development of an incentive price regulatory scheme to the expertise and judgment of FERC. Congress ordered that any such scheme could extend only to gas whose production "present[s] extraordinary risks or costs," NGPA § 107(c)(5), 15 U.S.C. § 3317(c)(5), and then only "to the extent that such special prices are *necessary* to provide reasonable incentives for the production of such high-cost gas," NGPA § 107(b), 15 U.S.C. § 3317(b) (emphasis added). The Conference Report accompanying the NGPA indicates the Congress considered such gas to include gas "produced from tight formations with little permeability," Joint Explanatory Statement of the Committee on Conference, Natural Gas Policy Act of 1978, H.R.Rep.No.95–1752, 95th Cong. 2d Sess., 87 (1978), reprinted in

[1978] U.S.Code Cong. & Ad.News, 8800, 8983, 9004. The statutory language, however, is both explained and limited by this illustration. Section 107(b)'s restriction of the right to claim the incentive price to situations where availability of a higher price was *necessary* to spur production made clear that the incentive price was not to be made indiscriminately available to any gas produced from geological formations having the high density sedimentation and low permeability characteristic of "tight formations." [11] Rather, it was to be made available only to gas recovered from wells whose development could be made economically feasible solely by application of "enhanced production techniques," R. at 1, such as hydraulic fracturing and explosive fracturing, *id.* at 2. Accordingly, the first task confronting FERC was devising methods of identifying gas wells whose increased production necessitated application of enhanced recovery techniques.

FERC's original proposal conditioned the availability of the incentive price, also referred to as the section 107 price, on a showing that the gas was recovered from a designated tight formation by means of a well which had been subject to an enhanced recovery technique, R. at 16–20. Comments received in the initial phase of rule-making convinced it to eliminate the requirement of well-by-well proof of actual application of an enhanced recovery technique, both because the qualification would pose difficult problems of administration, and because it could, by allowing the price only in retrospect, dampen interest in exploration of reserves the development of which was not

It is, of course, unnecessary to consider this alternative argument in light of our rejection of Pennzoil's and Shell's contention that the disputed requirement is a limitation on contractual authority to collect.

11. That gas is to be drawn from a geographic area designated as a tight formation does not necessarily mean that it can be recovered in reasonable quantities only upon application of enhanced production techniques. Many tight formations contain areas which have been or may be commercially developed without resort to recovery techniques entailing unusual expense or risk, *see* note 3, *supra*, Joint Appendix

on Review (R.) at 35; indeed, it is estimated that of the 200 trillion cubic feet of natural gas trapped in tight formations in the United States, half may be trapped "behind-the-pipe," that is, in reservoirs penetrated by old wells but never tapped, R. at 25, 29. While determination that gas is drawn from a tight formation is a necessary initial step in identification of gas which would not be produced absent the incentive of a higher price, the availability of the price must be further restricted to ensure that it does not become a windfall to production which would nonetheless occur.

certain to entail greater risks and costs.[12] Elimination of the enhanced recovery technique requirement, however, opened a deficiency in FERC's plan for identification of gas qualifying for the incentive price under the restrictive criteria of section 107. FERC corrected this deficiency by substituting the negotiated contract price requirement.

That the negotiated contract price requirement was designed to achieve indirectly the congressionally-mandated purpose previously served by the enhanced recovery technique requirement is apparent from the explanation of the requirement accompanying its introduction. FERC stated

> This requirement serves the purpose of insuring that the incentive maximum lawful price is extended as an incentive

**12.** FERC found persuasive comments indicating that its designation of "appropriate" enhanced recovery techniques, *i.e.,* techniques which it had identified as requiring extraordinary expenditures and promising substantial increases in production, would stultify innovation in methods of tight formation gas recovery. It also attributed its elimination of the requirement to the commentors' insistance that producers would not embark on development of tight formations if subsequent discovery that the fracturing techniques would be unnecessary would deprive them of the higher price. R. at 55–56.

**13.** Initial criticism of the negotiated contract price requirement spurred FERC to state

> The Commission believes that the price ceiling if applied to all tight formation gas may operate as a windfall to sellers rather than an incentive to increase production of tight formation gas. This occurs in any case in which one incentive price is established to cover a broad range of production costs and risks. This is especially true where both parties to the contract did not contemplate the availability of an incentive price. The Commission believes that the imposition of the negotiated contract price requirement is therefore necessary to insure that a purchaser is given an opportunity to bargain for increased production of tight formation gas before he agrees to pay a price higher than the otherwise applicable maximum lawful price. In this regard, the negotiated contract price requirement will operate as part of the ceiling price which the Commission is establishing under section 107(b). Thus, in the Commission's view a "necessary" price for tight formation gas is one that is contractual-

for the production of additional new tight formation gas, rather than just as a windfall to the sellers.... The Commission expects that purchasers will pay a higher price in return for increased production.

. . . . .

> The Commission must limit the appliction [sic] of the incentive ceiling to those contracts which specifically refer to it (or to the extent permitted under a fixed rate or a fixed escalator clause) because its pricing authority is limited to setting incentive prices "necessary" to encourage additional production.

R. at 58–59. FERC adhered to this explanation of the purpose of the negotiated contract price requirement throughout the remainder of the exchanges which concluded the rule-making proceeding.[13]

> ly agreed upon either at or below the ceiling price.

R. at 126. FERC reiterated its explanation in response to Pennzoil's renewal of the criticisms in its petition for rehearing:

> [T]he Pennzoil Group argues in its rehearing application that:
>
>> Section 101(b)(9) of the NGPA and the *Mobile-Sierra* doctrine provide a rule of construction that the private contractual rights of producers and pipelines are preserved inviolate *as long as their exercise of those rights does not result in the collection of a price which is in excess of the maximum lawful price.* As such, the Commission has no jurisdiction to abrogate or interfere with the exercise of private contractual rights by producers and pipelines. By requiring certain words to be used in a contract, and especially by imposing this requirement retroactively, the Commission has violated section 101(b)(9) of the NGPA and the *Mobile-Sierra* doctrine. [Emphasis added.]

This argument begs the question. Under Order No. 99, no incentive maximum lawful price is applicable unless the contract covering the sale of the tight formation gas contains a clause which specifically references the Commission's section 107(c) incentive pricing authority or which is a fixed rate or a fixed escalator clause. The Commission adopted this pricing provision to assure that a price collected under a contract is necessary to increase gas production.[3] The Commission emphasizes that parties are not barred from renegotiating their contracts to qualify for the Order No. 99 ceiling price.

[3] As stated in the preamble to Order No. 99:

> The Commission reaffirms the position taken in the interim rule that it must limit the

The requirement evoked "overwhelming," R. at 124, opposition. The cause of the dissention is apparent: by restricting eligibility for the incentive price to gas sold pursuant to contracts which set a fixed price, or apply a fixed escalator, or reference FERC's incentive pricing authority under section 107, the requirement denied the incentive price to gas sold under indefinite price escalator clauses which make no reference to § 107. Commentors, including petitioner Pennzoil and intervenor Shell, charge that FERC, in imposing the requirement, violated the *Mobile-Sierra* doctrine as embodied in NGPA § 101(b)(9), 15 U.S.C. § 3311(b)(9) by mandating specific contractual language as a condition precedent to the collection of the maximum lawful price for which the gas is qualified. That charge has been renewed in this petition for re-

view; this Court, like FERC, rejects it as premised on a misconception of the function of the negotiated contract price requirement in the incentive price regulatory scheme. The requirement does not act to deny collection of a price for which the gas qualifies under controlling definitional criteria; rather, the history of its development shows clearly that it is itself a part of the definition of gas entitled to the special incentive price.[14] The requirement was promulgated not under FERC's authority to prescribe incentive prices, but rather in satisfaction of its duty to define the gas qualifying for that special price in a manner consonant with the express mandate of the enabling statute.[15]

Determination that FERC in imposing the negotiated contract price requirement was exercising its authority to define gas

---

availability of the incentive price ceiling to those contracts which specifically refer to it (or to the extent permitted under a fixed rate or fixed escalator clause) because its pricing authority is limited to setting incentive prices "necessary" to encourage additional production. R. at 152–53.

**14.** Pennzoil argues that FERC has attempted to circumvent the *Mobile-Sierra* limitation on its jurisdiction over contractual pricing provisions by creating federal contract law deeming pricing provisions not among those sanctioned in its negotiated contract price requirement as an inadequate manifestation to the party's intentions to collect the section 107 price, in violation of proscriptions on its wholesale creation of federal contract law. *Pennzoil*, 645 F.2d at 383–87; *H.S. Phillips v. FERC*, 586 F.2d 465 (5th Cir. 1978); *compare California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978). Discussion of FERC's limited authority to develop a federal law of contracts is inapposite where, as here, FERC does not seek to define the adequacy of private contractual terms as authority to collect a price, but instead defines eligibility criteria for the special price. *Superior Oil Co. v. FERC*, 569 F.2d 971 (5th Cir. 1978), *cert. denied*, 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1979); *see* Part III A, *infra*. Area rate clauses may well remain sufficient contractual authority to collect this special price. However, although the producer may have sufficient contractual authority to collect it, he is not statutorily eligible for that price, a necessary predicate to its collection. Satisfaction of the negotiated contract price requirement simultaneously satisfies the requirement of sufficient contractual au-

thority, but that is only because of the unique legal eligibility criteria used in this case.

To emphasize that it was defining the category rather than dictating contract terms, FERC at oral argument explained that any producer operating under an indefinite price escalator clause contract who proposed to drill for or develop expensive tight formation gas could qualify for the higher price by requiring his pipeline purchaser to renegotiate their contract in the express terms provided as a consideration for proceeding with such drilling or development. If the intent to pay the higher price as well as the intent to charge it is present, the renegotiation is a mere formality and the higher price would be applicable.

**15.** We attribute no significance to the fact that the negotiated contract price requirement appears in the portion of the regulation describing the ceiling price, 18 C.F.R. § 271.703(a), rather than in the the section of the regulation defining tight formation gas, 18 C.F.R. § 271.703(b). Eligibility criteria listed in § 271.703(b) are those whose satisfaction is to be determined by the jurisdictional agencies, 18 C.F.R. § 274.-205(e). FERC's removal of the negotiated contract price requirement from the definitional section to the ceiling price section of § 271.703 indicates only that ascertainment of compliance with that requirement was not delegated to the jurisdictional agencies, R. at 126. The negotiated contract price requirement's insertion in the introductory clause to the section of the regulation defining the ceiling price operates as a further limitation on eligibility for that price; it does not lose its quality as one of the § 107 eligibility criteria merely by its repositioning in the regulation.

qualifying for section 107 treatment does not, of course, mean that exercise in that manner does not exceed the bounds of its authority. To that inquiry this Court now turns.

## III.

The regulation under attack was promulgated by FERC in response to the Congress' express direction to create a scheme providing reasonable incentives for the development of gas from unconventional sources.[16] The authority delegated by Congress was broad indeed: responsibility for both the identification of gas to which such incentives should be extended and the determination of the appropriate maximum lawful incentive price devolved upon FERC. Sparse guidelines incorporated in the statutory mandate established only the broad parameters of regulation. The remainder was left to FERC's reasoned application of its considerable experience and accrued expertise.

Judicial review of regulatory actions taken in fulfillment of this congressional mandate must accord to FERC that deference implied by such a broad authorization. *State of Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976); *accord Merchants National Bank v. United States*, 583 F.2d 19 (1st Cir. 1978) *citing Goldman v. Commissioner*, 497 F.2d 382 (6th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 295 (1975). That FERC's judgment will be accorded a certain degree of respect does not, of course, imply that its regulation will be sustained on nothing more than trust and faith in its experience, *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1365 (4th Cir. 1976). Rather, its action must reflect con-

sideration of the statutorily-defined relevant factors in a reasoned process of decision-making, *Hooker Chemicals & Plastic Corp. v. Train*, 537 F.2d 620, 632 (2d Cir. 1976). So long as it is neither arbitrary nor capricious and is "reasonably related to the purposes of the enabling legislation," *Mourning v. Family Publications Service*, 411 U.S. 356, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973); *Fredericks v. Kreps*, 578 F.2d 555, 561 (5th Cir. 1978) (en banc), the resultant regulation will be sustained.[17]

Three specific challenges are made to the negotiated contract price requirement. The first is that FERC is without authority, in its otherwise legitimate process of establishing eligibility criteria for a price classification, to define eligibility in part by reference to the terms of the private contracts governing the sale of the gas in question. The second is that the distinction drawn by the negotiated contract price requirement among various contract pricing provisions is arbitrary and unrelated to the purposes of the enabling legislation. The third is that, even if the requirement may otherwise be sustained as an appropriate and reasonable means to accomplishment of the statutory purpose, FERC is precluded from adopting it by other sections of the NGPA which endorse indefinite price escalator clauses as contractual authority to collect section 107 prices. Each will be examined in turn.

## A.

Advertence to the terms of private contracts in delineation of eligibility for price categories is not novel. Precisely this approach was sanctioned in cases approving reference to contractual "effective date" terms in determination of classification un-

---

**16.** *See* text at note 1 and note 2, *supra*.

**17.** Much energy has been expended in attempts clearly to articulate this elusive standard of review. These protracted efforts are testimony, if at all, to the utter inadequacy of the English language to convey succinctly the essence of the judicial perspective. In the end, their accumulated wisdom leads only to the conclusion that

In summary, we must accord the agency considerable, but not too much deference; it

is entitled to exercise its discretion, but only so far and no further; and its decision need not be ideal or even, perhaps, correct so long as not "arbitrary" or "capricious" and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record.

*American Petroleum Institute v. Environmental Protection Agency*, 661 F.2d 340, 349 (5th Cir. 1981).

der the tiered contract vintaging rate structure developed under the NGA, 15 U.S.C. §§ 717–717w, *Shell Oil Co. v. FPC*, 491 F.2d 82 (5th Cir. 1974), and to contractual expiration terms in determination of treatment of the contract under FERC's "replacement contract" corollary to the contract vintaging rate structure, *Superior Oil Co.; Austral Oil Co. v. FPC*, 560 F.2d 1262 (5th Cir. 1977). There appears no reason why contractual pricing provisions may not be used in like fashion.

Nor is FERC constrained in the use it makes of these terms to the effect which would be given them by governing contract law. *Superior Oil* considered and rejected an argument to the contrary strikingly like the one offered here by Pennzoil and Shell. At issue in *Superior Oil* was FERC's refusal to treat as a replacement contract within the terms of its replacement contract policy a contract which expired not by its original terms, as that policy required, but by virtue of its amended terms. The *Superior Oil* court sustained FERC's decision, holding that it, in looking to contractual terms to determine whether the gas sold thereunder *qualified* for a particular price classification could dictate the effect to be given these terms, so long as that effect was reasonably calculated to further its legitimate regulatory policies. *Superior Oil* at 074. The pertinent question, then, is whether FERC in limiting eligibility for the section 107 price to gas sold pursuant to contracts containing only certain pricing provisions, was acting in a manner reasonably calculated to further its legitimate regulatory policy. That question parallels the second challenge raised by Pennzoil and Shell.

### B.

FERC repeatedly explained its purpose in adopting the negotiated contract price requirement to be satisfaction of congressionally-defined limitations on the operation of the incentive pricing scheme. The agency argues that its restriction of the incentive price to gas sold under fixed price formulations or pricing provisions specifically referencing NGPA § 107 serves both the Congress' intention to allow the higher price only when necessary to spur production otherwise economically unfeasible, and the Congress' insistence that that special price provide not excessive but reasonable incentives for the development of qualifying resources. The pricing formulations falling within the terms of the negotiated contract price requirement are those which provide clear and unequivocal indication of consensus among the contracting parties that development of gas from the tight formation would be adequately compensated only by a price higher than that otherwise available under the NGPA. Market forces, reflected in that price or pricing formulation agreed upon, are deemed adequate to ensure that the incentive is not excessive.

Pennzoil and Shell argue that pricing formulations other than those included in the negotiated contract price requirement may also indicate private consensus on the section 107 price. It is true that indefinite price escalator clauses could define a price exceeding the otherwise applicable maximum and thus seemingly invoke the special incentives of section 107. In the absence, however, of specific agreement that the otherwise applicable price ceiling is to be supplanted by section 107 in limitation of the potential of the indefinite price escalator clause, the fact that operation of the clause defines a price in the section 107 range is, without more, ambiguous. There is no certainty that the parties actually contemplated abandonment of the otherwise applicable ceiling price and invocation of incentive pricing; such uncertainty will not support a conclusion that the section 107 price is essential to the development of the resources under contract. FERC's insistance on clear and unequivocal indication of the necessity of the incentive price is not arbitrary but a rational interpretation of its statutory duty. Its definition in the negotiated contract price requirement of contractual terms manifesting that unambiguous intention reflects a reasoned determination of the extent to which private contracts could be relied upon in attainment of the regulatory objective. No more is required

of it. *United States v. Allegheny-Ludlum,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *American Petroleum Institute* at 352.

### C.

The final challenge to the negotiated contract price requirement is derived from other sections of the NGPA. Pennzoil and Shell contend that NGPA §§ 313(a) and 105(b)(3)(D) indicate congressional endorsement of the use of indefinite price escalator clauses in contracts for the sale of high cost gas, and that such endorsement precludes restriction on such use. Examination of these sections discloses that they do not reach as far as the challengers contend. Both prescribe limitations on the effect of indefinite price escalator clauses. Section 105(b)(3)(D) ensures that indefinite price escalator clauses do not operate to bring the price for sales under intrastate contracts over the price provided in NGPA § 102, 15 U.S.C. § 3312. *See* NGPA Conference Report, *supra,* H.R.Rep.No.95–1752, 95th Cong. 2d Sess., 83 (1978), reprinted in [1978] U.S.Code Cong. & Ad.News, 8983, 8999–9000.[18] Section 313(a) ensures that high cost gas prices do not operate to trigger indefinite price escalator clauses applicable to gas other than high cost gas.[19] Neither section affirmatively dictates effective operation of indefinite price escalator clauses in situations not specifically proscribed.

### IV.

In deferring to the terms of private contracts in identification of gas whose production was elicited by the availability of the incentive price, FERC deftly incorporated the selective processes of the marketplace in a regulatory scheme intended to stimulate precisely those processes. FERC's decision to commit this identification to the producers and the pipelines in their agreement on a price high enough to compensate, while low enough to find an outlet in the consumer market, rather than itself identify through analysis of expenditures expect-

ed and incurred that production which would not have come to market absent the promise of increased remuneration, was a reasonable exercise of authority vested in it by the Congress. Its orders are affirmed.

AFFIRMED.

---

**18.** The text of section 105(b)(3)(D) is set out in note 7, *supra.*

