**OXY U.S.A., INC., Plaintiff–Appellee,**

v.

**SEAGULL NATURAL GAS COMPANY, f/k/a Liberty Natural Gas, Defendant–Appellant.**

No. 91–1436.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1992.

---

**800**

Patricia F. Eldridge and J. Clifford Gunter, III, Bracewell & Patterson, Houston, Tex., for defendant-appellant.

Elizabeth D. Whitaker, Diane M. Sumoski, Jeffrey S. Levinger, James E. Coleman, Jr., Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex. and Michael L. Pate, OXY, U.S.A., Inc., Tulsa, Okl., for plaintiff-appellee.

Before CLARK, Chief Judge, WILLIAMS and BARKSDALE, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant Seagull Natural Gas Company ("Seagull") appeals the district court's summary judgment in favor of Appellee OXY, U.S.A. ("OXY"). The district court found Seagull contractually liable to OXY for retroactive payments for tight sands gas delivered from January 1982 to April 1, 1983. Liability was premised on the permission granted in the contract in conjunction with 18 C.F.R. § 273.204 (1987).

Seagull asserts three bases for reversal of the district court's summary judgment: (1) the contract in question did not permit retroactive collections; (2) retroactive payments would render the market-out provision in the contract meaningless; and (3) OXY did not rely on the incentive price for tight sands gas in deciding to drill. We affirm the trial court's decision. The contract need not expressly authorize the collection of retroactive payments; it must only not foreclose that possibility. Retroactive payments do not render the market-out provision meaningless. The market-out provision, in fact, limits the amount OXY can collect retroactively. Finally, whether OXY relied on the incentive price for tight sands gas is irrelevant as long as there is a "negotiated contract price."

## I. REGULATORY BACKGROUND

A background of the regulations at issue sets the stage for this case. On July 15, 1979, President Carter addressed "a clear

and present danger to our Nation"—the energy crisis and our dependence on foreign oil. In response, the Federal Energy Regulatory Commission ("FERC"), under its authority set out in Section 107(c)(5) of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3301 et seq., implemented an incentive price for gas produced from a "tight formation."[1] Its general purpose was to allow producers to charge a higher price for gas produced from a "tight formation" in order to encourage them to spend the extra money necessary to recover the gas. In turn, natural gas customers would be using more domestic gas in place of foreign gas.[2]

As a means of preventing the higher price from being merely a windfall for the producer instead of an incentive to drill, the FERC established numerous requirements which a producer had to meet before he could collect the higher tight sands price. Initially, there was a four step process to obtain a tight formation designation for a well. First, the local regulatory authority—in this instance, the Texas Railroad Commission—had to recommend that a field be designated a tight formation. Second, the FERC had to designate the field as a tight formation.[3] Third, the local regulatory authority had to recommend that a specific well be classified as a tight formation well.[4] Fourth, the FERC had to approve the recommendation designating that well as producing tight formation gas.[5]

A producer was not authorized, however, to charge the higher tight sands price merely because a specific well had been designated a tight sands well. Instead, it was necessary that the contract between the buyer and seller contain a "negotiated contract price."[6] In theory, the "negotiated contract price" prevented the higher price for tight formation gas from being merely a windfall to the seller because the purchaser would only agree to a "negotiated contract price" if it was essential as an incentive to drill:

> A producer of tight formation gas does not have authority to charge these ceiling prices unless the producer has the requisite contractual authority.... The

1. "A 'tight formation' is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock. Because such a formation is characterized by low permeability, wells drilled into gas-bearing formations of this kind usually produce at very low rates. To stimulate production from these formations, producers must use expensive enhanced recovery techniques. The technique usually applied to tight formations involves massive hydraulic fracturing, which creates a system of cracks permitting trapped gas to flow more easily into a wellbore." Order No. 99 (Final Rule), 45 Fed.Reg. 56,034, 56,034–35 (1980). *See also, Pennzoil, Co. v. F.E.R.C.,* 671 F.2d 119, 120 (5th Cir.1982).

2. The tight formation gas program was in effect throughout the events of this case. The program, however, became less effective with the deregulation of much of the gas which qualifies as tight formation gas effective January 1, 1985. *See Williams Natural Gas Company v. F.E.R.C.,* 872 F.2d 438, 444 (D.C.Cir.1989), *appeal after remand,* 943 F.2d 1320 (D.C.Cir.1991). Furthermore, the incentive pricing program has been completely terminated for all gas spudded or recompleted after May 12, 1990 and for all production enhancement gas where the production enhancement work is begun after that date. *Limitation On Incentive Prices for High–Cost Gas to Commodity Values,* 55 FERC (CCH) ¶ 6367–01 (1990).

3. "Determinations [of a tight formation] by a jurisdictional agency must be made in the form and manner prescribed in Part 274 of this chapter." 18 C.F.R. 271.703(C)(1) (1982); *See also,* Order No. 99, 45 Fed.Reg. 56,034 (1980).

4. "A person seeking a determination for purposes of Subpart G of Part 271 that natural gas is new tight formation gas shall file with the jurisdictional agency an application which contains the following items ..." 18 C.F.R. § 274.-205(e) (1988). *See also,* Order No. 99, 45 Fed. Reg. 56,034 (1980).

5. "Except as provided in paragraphs (b), (c), and (d) of this section, a determination submitted to the Commission by a jurisdictional agency shall become final 45 days after the date on which the Commission received notice of the determination, unless ..." 18 C.F.R. § 275.202(a) (1979); *See also,* Order No. 99, 45 Fed.Reg. 56,034 (1980).

6. " 'Negotiated contract price' means any price established by a contract provision that specifically references the incentive pricing authority of the Commission under section 107 of the NGPA, by a contract provision that prescribes a specific fixed rate, or by the operation of a fixed escalator clause." 18 C.F.R. § 271.702(a)(1) (1984).

Commission believes that the imposition of the negotiated contract price requirement is therefore necessary to insure that a purchaser is given an opportunity to bargain for increased production of tight formation gas before he agrees to pay a price higher than the otherwise applicable maximum lawful price.... Thus, in the Commission's view a "necessary" price for tight formation gas is one that is contractually agreed upon either at or below the ceiling price.

Order No. 99 (Final Rule), 45 Fed.Reg. 56,034, 56,040–41 (1980).

The FERC determined that it was inappropriate to allow interim collection of the incentive price prior to designation of the formation. Order No. 99, 45 Fed.Reg. at 56,042. Instead, the FERC provided for retroactive collection of the incentive price for gas produced from qualifying wells.[7] Retroactive collection was limited, however, to the extent permitted by the sales contract.[8]

Thus, before a producer could charge the higher tight sands price retroactively, each of the following requirements had to be met: (1) the formation had to be designated a tight formation by both the local regulatory authority and the FERC; (2) the specific well in question also had to be designated a tight formation well by both the local regulatory authority and the FERC; (3) the sales contract had to contain a negotiated contract price; and (4) the contract had to permit retroactive collection of the tight sands price.

## II. FACTS

We turn to the facts of the case. In April of 1981, Seagull contacted OXY about the possibility of purchasing gas.[9] Negotiations followed until a gas sales contract was executed on September 11, 1981. Two relevant facts as to the negotiations are of particular significance. First, the six wells at issue in this case are all within the Travis Peak formation, and, during the negotiation process, the Texas Railroad Commission was considering whether to recommend the Travis Peak formation as a tight formation. Second, OXY insisted upon the inclusion of a negotiated contract price within the contract.

On October 26, 1981, the Texas Railroad Commission recommended that the entire Travis Peak formation be designated as a tight formation. The entire formation, however, has never been designated as a tight formation by the FERC.[10]

On September 10, 1984, the Texas Railroad Commission recommended that the Toolan Field within the Travis Peak formation be designated as a tight formation. The Toolan Field includes five of the six wells at issue in this case. The FERC designated the Toolan Field as a tight formation effective May 10, 1985. On June 24, 1985 and July 1, 1985, the Texas Railroad Commission recommended that OXY's five wells in the Toolan Field be designated tight formation wells. On July 17, 1985, OXY sent notice to Seagull indicating OXY's intent to collect the tight sands price on an interim basis for the five wells. OXY then sent notice to Seagull on August 5, 1985 that two of the wells had been designated as tight formation wells. OXY also sent notice on August 21, 1985 when the other three wells were designated as tight formation wells by the FERC. After

7. "[I]f an eligibility determination that first sales of natural gas from a well qualify for a maximum lawful price under Subpart B, C, G, or H of Part 271 has become final under Parts 274 and 275 ... the seller may retroactively charge and collect for such period the amount of such excess." 18 C.F.R. § 273.204(a)(1) (1987).

8. "Collection under this section may be made only to the extent permitted by the applicable sales contract." 18 C.F.R. § 273.204(c)(4) (1987).

9. For simplicity's sake, we will refer to the parties as OXY and Seagull. It should be noted, however, that prior to April 1, 1988, OXY was known as Cities Service Oil and Gas Corporation. Also, OXY originally entered into the Contract with Liberty Natural Gas, but Seagull became a successor in Liberty's interest in 1987.

10. A history of the proceedings with respect to the Travis Peak formation can be found in our decision in *Enserch Exploration, Inc. v. F.E.R.C.*, 887 F.2d 81 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

unsuccessfully attempting to collect $2,717,871.66 in retroactive payments for tight sands gas in the Toolan Field from Seagull, OXY filed its original complaint on June 29, 1987.

Subsequently, the Texas Railroad Commission recommended that the Appleby N. Field be designated as a tight formation, and the FERC approved this recommendation on December 6, 1988. The sixth well involved in this case is in the Appleby N. Field. On May 3, 1989, OXY sent notice to Seagull indicating OXY's intent to make retroactive collection for the gas from the well in the Appleby N. Field. The well was approved as a tight formation well by the FERC on August 19, 1989, and OXY sent Seagull notice of this fact on August 25, 1989. OXY then demanded $780,409.47 from Seagull for retroactive payments on the production of the well in the Appleby N. Field. When the retroactive payments were not forthcoming, OXY amended its complaint to include the sixth well.

OXY is attempting to make retroactive collections for all gas delivered from January 1982 through April 1, 1983. Deliveries under the Contract began in January 1982, and the market-out provision was exercised by Seagull and became effective on April 1, 1983. As later discussion shows, the use of the market-out provision preempted the effectiveness of the "negotiated contract price."

All parties involved agree the proper procedures were followed in classifying the wells as tight formation wells. Similarly, they agree the sales contract contains a "negotiated contract price" which allows prospective collection of the higher tight sands price. Thus, the only issue is whether the contract provides for retroactive collection of the higher price.

## III. DISCUSSION

This case turns upon the meaning and application of the word "permitted" in the regulation which provides: "[Retroactive] collection under this section may be made only to the extent permitted by the applicable sales contract." 18 C.F.R. § 273.204(c)(4) (1987). Seagull contends that the

applicable sales contract must expressly authorize retroactive payments. OXY, on the other hand, argues that such a contract allows retroactive payments unless it expressly forbids them. OXY's position comports with the legal definition of "permit" as well as the FERC's rulings on this issue.

*United States v. Launder,* 743 F.2d 686, 689 (9th Cir.1984), holds that the word "permitted" in the regulation "require[s] a willful act or a *willful failure to act* in the face of a clear opportunity to do so." (emphasis added). The case also cites the following definition of "permit": "To suffer, allow, consent, let; to give leave or license; *to acquiesce, by failure to prevent,* or to expressly assent or agree to the doing of an act." *Id. Black's Law Dictionary* (5th ed. 1979) (emphasis added). This holding accurately states the established law. OXY and Seagull's gas sales contract "permits" retroactive collections as long as it acquiesces in them by failing to prevent them.

OXY's interpretation allowing retroactive payments because the contract does not in terms forbid them comports with rulings of the FERC. In addressing the issue of whether a contract must expressly authorize retroactive collections, the FERC has consistently ruled that it does not. In *Independent Oil & Gas Association of West Virginia,* 18 FERC (CCH) ¶ 61,289 (1982) the Commission held:

> [E]xpress authorization for retroactive collection is not required. The parties could interpret their contract to permit such payments. We do not believe it appropriate to place too strenuous a burden on producers in this situation.... We believe it is more reasonable to interpret section 273.204(c)(4) as authorizing retroactive collections in all cases other than those where there is some explicit or implicit indication in the contract excluding retroactive collections.

*Williston Basin Interstate Pipeline Co. v. ARCO Oil and Gas Co.,* 37 FERC (CCH) ¶ 61,159, 61,394 (1986) describes the origin of the "permit" wording:

> The Commission has rejected the position that there can be no 'retroactivity' unless

the contract specifically provides for it by using the word 'retroactive.' ... The applicable statutory and regulatory provisions require that retroactive effectiveness be permitted to give effect to the availability to tight formation pricing as of July 16, 1979. Otherwise, the regulation establishing that availability date would be a nullity.

So also in *Northwest Central Pipeline Corporation,* 34 FERC (CCH) ¶ 61,301, 61,-551 (1986), the FERC said: "[T]he applicable statutory and regulatory provisions *require* that retroactive effectiveness be permitted to give effect to the availability of tight formation pricing as of July 16, 1979. Otherwise, the regulation establishing that availability date would be a nullity." (emphasis in original).

■■■ This Court, of course, is not bound by the rulings of the FERC. We do, however, give substantial deference to an agency's rulings, especially where, as here, the agency is interpreting its own regulations which Congress authorized it to prepare. *Texas Eastern Transmission Corp. v. F.E.R.C.,* 769 F.2d 1053, 1069 (5th Cir. 1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1967, 90 L.Ed.2d 652 (1986), *appeal after remand* 902 F.2d 795 (10th Cir.1990); *Pennzoil Company v. F.E.R.C.,* 645 F.2d 360, 383 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982); *Columbia Gas Development Corp. v. F.E.R.C.,* 651 F.2d 1146, 1151, 1155 (5th Cir.1981). We hold that the regulation has the effect of allowing retroactive payments unless the contract expressly forbids them.

■■ We turn to the contract. The relevant provision states:

> ... In the event Seller files and qualifies for Section 107 under the provisions of the NGPA and FERC regulations, then *on the date the Buyer receives a copy of Seller's filings* in accordance with § 273.202 of the FERC regulations, Buyer agrees to *pay* Seller *thence forward* for each MMBTU of *gas delivered hereunder that qualifies* an amount equal to the price provided by Subpart G of Part 271 in Table I of § 271.101(a) of the FERC regulations ... for such gas

provided under the NGPA and FERC regulations....

Paragraph 6b of the Contract (emphasis added).

The starting point for the analysis of this critical contract provision is the fact that, when contract negotiations began, application was already pending and being processed for the Travis Peak Field to be declared a tight sands field. The contract was negotiated with the intention of OXY getting tight sands designation for all of its wells. The critical regulations were also in place, and OXY insisted upon this contract provision as a negotiated contract price provision. With these circumstances fully in mind what appears to be a highly ambiguous contract term becomes much clearer.

Both parties take the position that the contract is not ambiguous, but of course they come out with opposing interpretations. Seagull's basic claim is that the words "thence forward" constitute a specific denial of any possible retroactive payments being authorized by the contract. In their immediacy these words do seem to have that connotation. But taking the provision as a whole, together with the entire contract and the knowledge and understanding of the parties, it is clear that "thence forward" has to do with the payment for the gas, not the date upon which an authorized increase was added to the price because the gas ultimately had been classified retroactively as tight sands gas. In this light, the words constitute a protection of Seagull against having to pay a higher price in anticipation of a tight sands declaration.

This interpretation is best supported by recognizing that the purpose of this provision was to insure that OXY got tight sands price for the gas it sold if it was successful in getting a tight sands designation. Broadening this analysis one step further, it is clear that the statute and the regulations, together with a negotiated contract price provision, contemplate that all tight sands gas ultimately would be paid for at a tight sands gas price. The parties were well aware that the process for get-

ting a tight sands designation could be long and drawn out. The statute and the regulations cannot be contemplated as providing for the payment of tight sands prices for gas produced only after this process, taking as much as several years, was completed.

The thrust of the contract and this provision was that tight sands gas would be paid for at the tight sands rate prescribed by the government. It was not a blank check to the producer to charge anything it desired. It was a government regulated price premium for the purpose of encouraging the production of natural gas. It is obvious the parties knew this and understood it.

Another possible aspect of the interpretation of the "thence forward" wording of the contract would be that a copy of the "filings" of OXY to obtain tight sands designation had to have been given to Seagull before the entitlement to retroactive payment would begin. Note that this requirement was not notification of the final orders but was simply notification of the filing. Actually, Seagull, of course, knew about the filings, but further, OXY wrote a letter, when production began, to Houston Pipeline Company with which Seagull had a 100% pass-through agreement on price and told them that they would be liable for the tight sands price from the date of production. Seagull does not make an issue of this aspect of the critical contract provision. If "thence forward" is read to be related to the original filings as a notice requirement, it is obvious that the parties had such notice.

The conclusion that the statute, the regulations, and the contract contemplated that any gas that was produced as tight sands gas be paid for at the tight sands gas price did not put Seagull in a long-term precarious situation. The contract contained protection for Seagull in the market-out clause.[11] Under it, Seagull was protected because if it began to believe that gas it was buying was going to be granted a tight sands designation and that the price might become an excessive burden, it could exercise the market-out clause to protect itself. And, indeed, that is exactly what it did over two years before the first wells were designated tight sands wells. The date of exercise of the market-out provision was April 1, 1983, and this ended any possibility of retroactive payments for tight sands gas produced after that date. This explains why OXY is asking for the tight sands premium retroactively only from the beginning date of production until April 1, 1983.

Seagull's final contention is that OXY did not rely on the tight formation price as an incentive to drill its wells. OXY began drilling before the formation was designated a tight formation. Of course, OXY likely began drilling assuming the wells would eventually be designated tight formation wells. Its negotiations with Seagull and its notice to Houston Pipeline show this. But whether OXY relied on the tight formation price as an incentive is irrelevant. The FERC acted throughout on the policy basis that a case-by-case determination of whether the tight formation price provided an incentive was unnecessary. Instead, the requirement of a "negotiated contract price" was necessary to establish the necessity of the tight sands price. Order No. 99, 45 Fed.Reg. at 56,041. In *Pennzoil Co. v. F.E.R.C.,* 671 F.2d 119, 128 (5th Cir. 1982), we upheld Order No. 99 stating that "[i]n deferring to the terms of private con-

---

**11.** Paragraph 6e of the Contract states: "Notwithstanding the foregoing provisions of this Section 6, if at any time and from time to time Buyer determines that economic conditions indicate a downward change in the value to Buyer of the gas purchased from Seller, then Buyer is hereby given options to cause the price to be paid by Buyer for Seller's gas to be renegotiated.... Such renegotiated sales shall be at any price and under any terms and conditions as may be mutually agreed upon by the parties. However, in the event the parties cannot mutually agree, then Buyer and Seller agree that the renegotiated price shall be that price which Buyer determines unilaterally to represent the economic value of such gas to Buyer, and in such event, Buyer and Seller agree further that at any time within thirty (30) days after the date unilaterally set renegotiated price becomes effective, Seller may elect to terminate this Contract if it can sell such gas to another pipeline company which is ready, willing and able to purchase such gas at a price higher than the unilaterally set renegotiated price, by giving written notice of such election to Buyer."

806

tracts in identification of gas whose production was elicited by the availability of the incentive price, FERC deftly incorporated the selective processes of the marketplace in a regulatory scheme intended to stimulate precisely those processes".

In other cases in which a party has questioned whether the tight sands price actually provided an incentive for the producer to drill, the courts have similarly held the existence of a "negotiated contract price" is the only requirement to show necessity. *See Midwest Gas Users Ass'n v. F.E.R.C.*, 833 F.2d 341, 344 (D.C.Cir.1988) ("On the merits, we conclude that the Commission's determination that negotiated contract prices do not require case-by-case justification is a reasonable statutory interpretation"); *Williams Natural Gas Company v. F.E.R.C.*, 872 F.2d 438, 442 (D.C.Cir. 1989), *appeal after remand*, 943 F.2d 1320 (D.C.Cir.1991) ("Without [the negotiated contract price] requirement, the Commission believed, the incentive price might simply provide a windfall to a producer that had plainly expressed its willingness to sell gas at a lower rate. The presence of a negotiated contract price, on the other hand, was regarded as conclusive evidence that the incentive price was in fact necessary to induce production").

It follows that Seagull's challenge of OXY's reliance upon the tight sands price, not having been based upon as an incentive to drill, also must fail. OXY's reliance was irrelevant since the regulatory requirement was only that there be a negotiated contract price.

## IV. CONCLUSION

We find that since the contract between Seagull and OXY did not prohibit retroactive collection of the tight sands price, OXY was "permitted" to make such collections under 18 C.F.R. § 273.204 (1987). This conclusion justified the district court's summary judgment for OXY awarding retroactive price differentials.

AFFIRMED.